UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**FRESHWATER ACCOUNTABILITY
PROJECT,**

          **Plaintiff,**

    **v.**

**UNITED STATES ARMY CORPS
OF ENGINEERS*, et al.*,**

          **Defendants.**

**Case No. 2:20-cv-6168**
**JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Elizabeth P. Deavers**

**OPINION AND ORDER**

This matter arises on Plaintiff FreshWater Accountability Project's ("Plaintiff") Partial Motion for Summary Judgment (ECF No. 40), Defendant United States Army Corps of Engineers and Colonel Jayson Putnam's (collectively, "the Corps") Motion for Summary Judgment (ECF No. 46), and Intervenor Defendant DeepRock Disposal Solutions, LLC's ("DeepRock") (together with the Corps, "Defendants") Motion for Summary Judgment (ECF No. 45). All parties seek judgment as a matter of law on the administrative record.

For the reasons stated herein, the Court **DENIES** Plaintiff's Partial Motion for Summary Judgment (ECF No. 40), and **GRANTS** Defendants' cross-motions for summary judgment in full. (ECF Nos. 45, 46.)

**I.**

**A.  March 2020: DeepRock Applies for a § 10 Permit**

In 1932, the National Refining Company built a barge dock on an embankment of the Ohio River near Marietta, Ohio. (R. at 1410.) Numerous oil companies would come to use the dock to transport their products in the decades to come. (R. at 1410, 4169-71.) By 2020, however, the dock

1

sat unused. Then came DeepRock. (R. at 4-7.) At that point, the company—which specializes in the storage and disposal of oil wastewater—had both purchased the dock and installed numerous, inland waste storage facilities (known as "Class II injection wells") across the road abutting it. (R. at 423, 4175, 4345.)

Initially, DeepRock relied on trucks to transport its "Class II wastewater" (or "water associated with hydraulic fracturing") to its wells, usually at great distance (*i.e.*, "250-300 miles per round trip") (R. at 424.) By March 2020, however, the company decided to pursue a new, barge-based method of transporting its waste product. (*Id.*) And to offload that product, it sought to "reactivate[]" its dock, which was already equipped with a pipeline that could transfer wastewater to the company's injection wells. (R. at 6, 425.)

DeepRock, however, could not put its plan into effect without, among other things, gaining approval from the Corps, which is tasked under § 10 of the Rivers and Harbors Act ("RHA") with regulating "structures or work" which "affect[] [the] navigable waters of the United States." 33 C.F.R. § 322.1; *see* 33 U.S.C. § 403. Accordingly, on March 29, 2020, DeepRock applied for a "§ 10" permit. (R. at 6.) As it noted in its application, the company specifically sought to "reactivate an existing commercial river dock (formerly identified / operated as Itapco) for the transfer of traditional well waste (wastewater) to existing upland storage tanks." (*Id.*) DeepRock continued:

> The commercial river dock is pre-existing and will not require any construction, repair and/or dredging. The existing commercial river dock consists of a barge dock with a center platform and two (2) dolphins to accommodate a barge (barge size up to 297-feet by 54-feet). The river dock consists of an existing crane capable of handling hoses for the purposes of connecting dock pipe valves to the barge piping valves. A 90-foot walkway / pipeway extends from the dock to the top of the river bank. The existing two (2) interlocking piling dolphins . . . extend 150-feet upstream and 75-feet downstream from the dock for mooring of the tank barge(s) . . . The overall facility will extend approximately 241 linear feet along the shoreline.

2

(*Id.*) DeepRock also highlighted that it had either obtained or intended to pursue various permits from other state and federal agencies to facilitate its "project," including: (1) a 401 Water Quality Certification from the Ohio Environmental Protection Agency ("OEPA"); (2) a "modification of [an] existing Chiefs Order for Class II injection well facility" by the Ohio Department of Natural Resources ("ODNR"); and (3) an "approval to operate under 33 CFR 105.400-415" from the United States Coast Guard (the "U.S. Coast Guard" or "USCG"). (*Id.*)

Part of DeepRock's § 10 application required the company to disclose "any species listed as endangered or threatened under the Endangered Species Act that might be affected by" its proposed activity. (R. at 7.) To that end, the company noted its barge facility was "located on the Ohio River and within a known or historic range" of several endangered mussel species. (*Id.*) It reiterated, however, that (1) its reactivation of the facility would "not require any construction, repair, and/or dredging," and (2) it had already received written assurance from the United States Fish and Wildlife Service ("U.S. Fish and Wildlife Service" or "USFWS") that its proposed project would have "no adverse impact" on any endangered or threatened species. (*Id.*) As proof, DeepRock attached a copy of the USFWS' confirmation to its application. (R. 7, 72.)

**B.** **April 2020 – August 2020: The Corps Disseminates Two Public Notices and Holds a Virtual Public Meeting**

**i.** **The Corps Issues Public Notice of DeepRock's § 10 Application**

On April 7, 2020, the Corps issued Public Notice No. LRH-2020-293-OHR (the "Public Notice")—the first of several public announcements regarding DeepRock's § 10 application. (R. at 4270-77.) Among other things, the Public Notice (1) described the location of DeepRock's barge loading dock, as well as the activity for which the company sought § 10 approval, (2) confirmed that DeepRock's proposal was not subject to § 404 of the Clean Water Act, 33 U.S.C. § 1344, as it "would not involve the discharge of dredged and/or fill material into waters of the United States,"

3

(3) discussed DeepRock's intended efforts to avoid and minimize its "impact" on the Ohio River—specifically, by implementing a "[s]tormwater management plan[]"—and (4) noted that the "proposed project [was] located within the known or historic range" of several endangered bats and mussels. (R. at 4270-71.) Notwithstanding the latter acknowledgement, the Corps concluded DeepRock's proposed activity "would have no [e]ffect" on the endangered bats and was "not likely" to have any adverse impact on surrounding mussel populations. (R. at 4271.) This was so, the agency reasoned, as the barge's "reactivation" would not involve the removal of any nearby foliage or require any dredging. (R. at 4271.) Nevertheless, the Corps still sought a "concurrence from the [USFWS]" as to the loading dock's potential impact on surrounding endangered or threatened species. (*Id.*)

The Corps ended its Public Notice by confirming that its review process would "be based on an evaluation of the probable impacts, including cumulative impacts, of [DeepRock's] proposed activity on the public interest" and would "reflect the national concern for both the protection and utilization of important resources." (*Id.*) To facilitate that analysis, the agency solicited comments "from the public, Federal, state and local agencies and officials, Indian Tribes and other interested parties," all to be submitted within thirty days (*i.e.*, by May 6, 2020). (R. at 4270, 4272.) These comments, the Corps added, would be used to assess the "impacts of the proposed activity," as well as "to determine the need for a public hearing and . . . the overall public interest of the proposed activity." (R. at 4272.)

### ii. The Public Weighs In

By the end of the thirty-day comment period, the Corps received forty-three public comments in relation to DeepRock's § 10 application and one "Concerned Citizens" petition with 493 signatures. (R. at 4175.) Of the comments the agency received, twenty-four requested a formal public hearing, while twenty-six requested an extension of the comment period. (R. at 4279.) Four

4

individuals and the signatories of the "Concerned Citizens" petition requested or raised the topic of permit denial. (*Id.*) Numerous others raised on an array of economic, ecologic, and environmental concerns with DeepRock's use of the barge loading dock, including those related to "spill prevention and emergency response, radiation protection, chemical analysis/testing of cargo, quantities, origin, and types of waste to be received . . . noise, flooding . . . and drinking water and aquifers."[1] (R. at 4180-81.) The Corps also received six comment letters from various "state agencies and Tribes"—including the USFW's Ohio field office and the Ohio State Historic Preservation Office—none of which objected to, or otherwise raised a specific concern with, DeepRock's permit application.[2] (R. at 4175-80.)

### iii. The Corps Declines to Extend the Public Comment Period

On June 17, 2020, the Corps announced via public memorandum (the "June 17 Memo") that the comment period for DeepRock's § 10 application would not be extended. (R. at 904-19.) Before reaching this decision, the agency offered a preliminary evaluation of the public comments it had thus far received. (*Id.*) Therein, the Corps noted, among other things, that:

- "[t]he occurrence of spill events is not within the purview of the [its] regulatory authority," as "[t]he USCG is responsible for navigational safety on the Ohio River, which includes both industrial and public safety." (R. at 909.)

- Under USCG rules, DeepRock "would be required to implement and maintain a[n] [approved] Facility Security Assessment and Facility Response Plan . . . which [would]

---

[1] As a whole, the following topics were raised:

> Public Notice extension, adequacy of the Public Notice, nature of the cargo, dock configuration and existing conditions, spill prevention and emergency response, radiation protection, chemical analysis/testing of cargo, quantities, origin, and types of waste to be received, economic impacts, aesthetics, public health, noise, flooding, property ownership, recreation, drinking water and aquifers, traffic, fault destabilization, seismic activity, and earthquake damage, endangered and threatened species, historic properties, cumulative impacts, the need for an Environmental Impact Statement (EIS), and permit denial.

(R. at 4180-81.)

[2] Specifically, the USFWS' Ohio field office "concur[red]" with the Corps' determination that DeepRock's "project, as proposed, is not likely to effect" the various endangered mussel species that inhabited a nearby area, given that its proposed activity required "no additional . . . in-water work." (R. at 4176-77.)

include security procedures that prevent offloading operations under severe weather and river conditions such as flooding." (R. at 908.) Should DeepRock's § 10 application be approved, the agency added, DeepRock would be "additionally" bound to submit for approval a "Facility Operating Plan (FOP)" that "addresse[d] safety procedures," including those related to "high water procedures . . . leaking barges, and spill and breakaway notification." (R. at 909.)

- DeepRock "currently operates" its injection wells "under a [United States Environmental Protection Agency ("U.S. EPA")] certified and approved [Spill Prevention, Control and Countermeasure]-Facility Response plan," and "[b]oth the [U.S. EPA] and the USCG spill prevention programs require routine and frequent training, inspections, and execution of emergency response drill scenarios to test the effectiveness of the facility's associated written programs." (R. at 910.) The Corps further noted that DeepRock's "[o]ilfield fluid disposal" activity "is regulated by the [ODNR's] Division of Oil and Gas Resources Management pursuant to Ohio Revised Code (ORC) 1509.22[.]" (*Id.*)

- "[c]omments concerning ground water and aquifers are not within the purview of the Corps' regulatory authority," and regardless, (1) DeepRock's offloading facility "is not located within the City of Marietta Source Water Protection Area, as defined by the [OEPA]," and (2) "[o]peration of a Class II injection well facility requires review, approval, and oversight by the USEPA under Section 1422 and 1425 of the Safe Drinking Water Act for the protection of underground sources of water." (R. at 915.)

- it directly sent the OEPA its Public Notice (as well as a follow-up email) to confirm whether "their agency would require a Section 401 water quality certification for the proposed project." (*Id.*) "To date," the Corps stated, the OEPA had yet to respond. (*Id.*)

- "[t]he Ohio River is a predominantly commercial use waterway and its banks have been occupied by river facilities such as fleeting areas, unloading facilities, barge repair facilities, and industrial plants prior to the 1900's[;]" that facilities "similar" to DeepRock's offloading dock "are located upstream and downstream . . . along both banks of the Ohio River[;]" and that "[t]he existing offloading facility is located within an area that is zoned as commercial/industrial." (R. at 912.) All of this, the Corps surmised, meant DeepRock's facility "would not be inconsistent with the current and surrounding land use." (*Id.*)

- to the extent there was concern DeepRock's use of the dock would affect surrounding fish and wildlife, the Corps had "consulted with USFWS and the ODNR regarding" that issue. (R. at 916.) Based on their interactions, the Corps determined that DeepRock's use of "the facility would result in temporary minor adverse effects on aquatic habitat at the site." (*Id.*) Again, the Corps stated, "[n]o trees or vegetation would be removed to facilitate the operation of the proposed project," and "no dredging and/or fill material within waters of the United States is proposed." (*Id.*)

6

In light of the above, the Corps determined "that ample opportunity has been provided to the general public to express their concerns, that all concerns are being addressed, and no valid interest would be served by [] extending the [Public Notice] comment period." (R. at 918.) Nevertheless, to ensure the public had "an opportunity to present their views, opinions, and information on the permit application," the Corps confirmed it would (1) arrange an "informal virtual public meeting" (the "Virtual Meeting") and (2) issue another public notice detailing the meeting's logistics thirty days before it occurred. (*Id.*) To determinine whether an additional, formal public hearing would be needed, the Corps noted it would consider any "[c]omments and requests for additional information" submitted to the agency up to ten days after the [Virtual Meeting]." (*Id.*)

### iv. The Corps Holds a Virtual Public Meeting to Discuss DeepRock's § 10 Application

On July 8, 2020, the Corps publicly set the Virtual Meeting for August 7, 2020, from 5:00 P.M. to 6:30 P.M. (R. at 960-62.) As its public notice explained, any citizen who wished to participate in the meeting was required to "RSVP" by email, at which point he or she would be sent instructions on how to attend. (R. at 960, 1133.) All questions were to be submitted electronically either before or during the event. (R. at 960-61.)

On August 7, 2020, the Virtual Meeting occurred. (R. at 4176.) Therein, the Corps provided an "[o]verview" of its regulatory program, a description of DeepRock's proposed use of its loading dock, and a thirty minute "Questions and Answers Session." (R. at 961, 1328-51.) Thirty-five members of the public attended. (R. at 4281.) Of those, thirteen provided "oral statement[s]" on the matter. (*Id.*) Several speakers complained of the meeting's "confusing messaging and logistics," and thus argued that a formal public hearing must be held.[3] (R. at 4331-33.) Many

---

[3] Similar complaints were received by the Corps after the meeting occurred. (*See* R. at 1511, 1627.)

reiterated a general concern with the "radioactive and hazardous components" of the waste DeepRock handled. (*Id.*) Others bluntly stated that DeepRock's permit should be denied, as it was "a matter of when, not if, there would be a spill." (*Id.*) And at least one attendee—counsel for Plaintiff—asked the Corps to produce an environmental impact statement (or "EIS"). (R. at 4331.)

### C. August 2020 – October 2020: The Corps Conducts an "Environmental Assessment" and Approves DeepRock's § 10 Application

#### i. The Corps Declines to Hold a Formal Public Hearing

On September 16, 2020, the Corps announced it had "sufficient information to complete its independent analysis" of DeepRock's § 10 application—and, thus, that no formal hearing would be held. (R. at 4282-90.) It based this decision on its "independent evaluation of the Public Notice comments and Public Meeting comments, as well as [DeepRock's] response" thereto. (R. at 4289.)

Simultaneously, the Corps summarized and responded to the most common concerns raised at the Virtual Meeting. (R. at 4283-89.) Much of the agency's response echoed the June 17 Memo, particularly its stance that the U.S. Coast Guard —not the Corps—"regulate[s] the transportation of cargo along navigable waterways," as well as "the nature of the cargo to be transported." (R. at 4284-85.) The Corps likewise noted, among other things, that DeepRock's "proposal has been coordinated with all applicable state and federal agencies who have authority and jurisdiction at the site of the proposed project." (*Id.*)

#### ii. The Corps Completes its Environmental Assessment and Subsequently Issues DeepRock's § 10 Permit

On September 25, 2020, the Corps issued an "Initial Proffered Permit" for DeepRock's "reactivation" of its barge dock. (R. at 4163.) Attached to its decision was a roughly 100-page "Environmental Assessment" which, at bottom, found that DeepRock's permitted activity would "not have a significant impact on the quality of the human environment." (R. at 4166-267.) This

"Finding of No Significant Impact" (or "FONSI") meant that the Corps would not produce a full EIS. (*Id.*)

The Corps predicated its FONSI determination on a site-specific review of DeepRock's proposed activity—*i.e.*, by largely focusing on the direct "foot print of the unloading facility within waters of the United States and its associated walkway," rather than the potential downstream effects of DeepRock's transportation and storage of "Class II wastewater." (R. at 4174, 4183-85.) As the agency again noted, *other* federal and state agencies (*e.g.*, the U.S. Coast guard, U.S. EPA, U.S. Fish and Wildlife Service, Occupational Safety and Health Administration, and ODNR) regulated the latter activities—meaning, by extension, that they did not "fall within the Corps' regulatory purview." (R. at 4236; *see also* R. at 4202.) For that reason, the agency added, it would generally cabin its focus to the local "impacts" of DeepRock's "operation of the barge dock"—all of which it found to be "negligible" in comparison to the various "benefits associated with the project," which largely stemmed from DeepRock's diminished need to rely on trucks to transport its waste.[4] (R. at 4172, 4206-07, 4221.)

---

[4] The Corps, in relevant part, surmised its environmental analysis accordingly:

> The proposed project would include the operation [of] an existing barge unloading facility to transfer traditional well waste to existing upland storage tanks. The proposed project does not include expansion or modification of the existing barge mooring capacity. No construction or discharge of dredged and/or fill material within waters of the United States is proposed. Additionally, no dredging would be required to facilitate the operation of the facility. The [Valued Ecosystem Components ("VECs")] include aquatic ecological resources (river habitat, water quality, and aquatic life), riparian and terrestrial ecological resources (flood storage, pollutant filtering, and terrestrial habitat), wildlife (mammals, birds, plants, reptiles, and amphibians), recreation, and land use. The VECs that have the most potential to be negatively affected by the operation an existing barge unloading facility include water quality, aquatic life, and terrestrial habitat. Short-term adverse effects would include impacts from the maneuvering operations and movement of barges, such as increased turbidity, noise, and visual impacts. However, a barge unloading facility has been present at the subject site since 1932. The existing unloading facility is located within an area that is zoned as commercial/industrial. Operation of the existing facility would not be inconsistent with the current and surrounding land use. Nuisance noise when barges are being delivered and unloaded would likely be minor as the area is zoned as commercial/industrial. Additionally, no trees or vegetation would be removed to facilitate the operation of the proposed project. These VECs are also being affected in the cumulative impact area watershed by residential, recreational, industrial, and commercial developments, municipal developments, crop production, grazing and feeding

Notwithstanding its FONSI determination, the Corps acknowledged that its § 10 permit would come with numerous "special conditions," including requirements for DeepRock to (1) submit "a Spill Prevention, Monitoring, and Response Plan" within thirty days of the barge dock's renewed operation, and (2) obtain "all necessary permits, certifications or other approvals from federal, state or local regulatory agencies," including the U.S. Coast Guard. (R. at 4261-62.)

### D. The Corps Issues DeepRock's § 10 Permit; Plaintiff Files Suit

On October 2, 2020, the Corps officially issued a § 10 permit for DeepRock's barge facility. (ECF No. 30.) Two months later, on December 2, 2020, Plaintiff brought a four-count suit against

---

operations, industrial point source discharges, stormwater runoff, and on-site home sewage treatment systems. Past and present actions that have resulted in the existing conditions in the cumulative impact area watershed include: recreational structures, residential and commercial developments, utility activities, and the maintenance, development, and expansion of road and river transportation TMDL report for Southeast Ohio River Tributaries, which includes the Mile Run-Ohio River Watershed (HUC-12 050302020102), is currently in progress. Therefore, there are currently no 303(d) listed water Biological and Water Quality Study of Selected Southeastern Ohio River Tributaries, 2015 (Enclosure 8) dated August 2019 indicates impairments within the watershed are due to home sewage treatment systems.

*** 

Effects on public health and safety have been considered in this document. All applicable environmental and health and safety regulations would be adhered to during operation of the proposed project. Procedures would be implemented to eliminate the possibility of spills and implement emergency response procedures (Reference Corps Response 5 under "Public Notice Comments"). The applicant would use appropriate equipment or machinery and operations techniques including protective devices and operator training . . . Spill prevention and control plans and proper material handling procedures are required by the OSHA. The storage of fuels, oils, and other potentially toxic fluids and the maintenance and refueling of equipment would occur in accordance with the provisions of the [best management practices, or "BMPs"]. Procedures would be implemented to eliminate the possibility of spills and to control dust that could enter the waterway by runoff or point source discharge . . . The proposed project would have no appreciable effects on human use characteristics such as municipal and private water supplies, recreational and commercial fisheries, and water-related recreation and no effects on local, state, or national parks. No residences, businesses, schools, churches, parks, recreational areas, or other public facilities have been or would be acquired, relocated, removed, or substantially affected by the proposed project.

No public, scenic, or recreational facilities are present within the proposed project site. There are no Federal wilderness areas, wildlife refuges, or designated critical habitat within the immediate vicinity of the proposed project. The project area is not within the boundaries of the National Park System, National Wildlife Refuge System, National System of Trails, National Wilderness Preservation System, Wild and Scenic Rivers System, National Recreation Areas, National Forest, or designated critical habitat.

(R. at 4248-51.)

the Corps seeking, among other things, (1) a judicial declaration that the agency's approval of DeepRock's § 10 permit was procedurally inadequate under both the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C 706(2),[5] and (2) an order setting aside the permit. (Compl., ECF No. 1.) DeepRock intervened as a defendant soon after. (ECF No. 32.)

Five months later, in September 2021, Plaintiff, citing the administrative record, moved for partial summary judgment on Counts I, III, and IV of its complaint. (ECF No. 40.) After receiving an extension, Defendants filed cross-motions for summary judgment on all of Plaintiff's claims in January 2022. (*See* DeepRock's Mot., ECF No. 45); (Corps Mot., ECF No. 46.) In April 2022, all dispositive motions became ripe for review. (Def.'s Replies, ECF Nos. 48, 49.)

## II.

### A. Judicial Review Under NEPA and the APA

Challenges to federal permitting decisions—including those rendered pursuant to NEPA—are governed by the APA. *See, e.g.*, *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 706 (6th Cir. 2014). That means they are subject "arbitrary-and-capricious" review. *Id.* Typically, this requires the Court to engage in an "extremely deferential" (albeit "searching and careful") analysis of the Corps' actions. *See id.*; *Jones v. Metro Life Ins. Co.*, 385 F.33d 654, 661 (6th Cir. 2004). "APA actions involving NEPA," however, invoke "a special standard of review for arbitrariness"—one that, as usual, requires this Court "not [to] substitute [its] own judgment' for that of the [Corps]," while simultaneously "insist[ing] that the agency has,

---

[5] Plaintiff's Partial Motion for Summary Judgment takes a somewhat different tack than its Complaint. For the first time, it argues that the Corp's approval of DeepRock's § 10 permit violated not only NEPA, the RHA, and APA, but *also* the Clean Water Act ("CWA"). (Pl.'s Mot., ECF No. 40 at PageID #8992, 8994, 9002, 9007). It does so, however, only superficially. At no point does Plaintiff cite to a specific provision of the CWA. Nor does it appear to tailor any of its substantive arguments to the statute. (*See id.* at PageID #9000) ("The applicable substantive laws are NEPA, RHA, NEPA's implementing regulations, and regulations of [the Corps]"). The Court, accordingly, sees no reason to entertain the issue.

in fact, adequately studied the issue and taken a hard look as the environmental consequences of its decision." *Latin Ams. for Soc. & Econ. Dev. v. Admin. of Fed. Highway Admin.*, 756 F.3d 447, 464 (6th Cir. 2014) (quoting *Meister v. U.S. Dep't of Ag.*, 623 F.3d 363, 377 (6th Cir. 2010)).

"Judicial review of NEPA compliance is limited in scope." *Id.* at 706. (quoting *Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 407 (6th Cir. 2013)). That is because the statute is "procedural," rather than "results-driven[.]" *Id.* (quoting *Ohio Valley Env't Coal v. Aracoma Coal Co.*, 556 F.3d 177, 191 (4th Cir. 2009)). In other words, it aims to ensure that the relevant agency (1) "adequately considered and disclosed the environmental impacts of its actions" and (2) otherwise rendered a decision that was not "arbitrary and capricious." *Id.* Thus, "even agency action with adverse environmental effects can be NEPA-compliant so long as the agency has considered those effects and determined that competing policy values outweigh those costs." *Id.* (quoting *Aracoma Coal*, 556 F.3d at 191).

### B. Summary Judgment

Summary judgment is the appropriate "mechanism" for adjudicating claims arising under the APA. *See* 2 Am. Jur. 2d Admin. Law § 544; *see Norton v. Beasley*, 564 F. Supp. 3d 547, 569 (E.D. Ky. 2021), *appeal docketed* Nov. 9, 2021 (No. 21-6053). In resolving these claims, the Court must "determine whether or not, as a matter of law, the evidence in the administrative record permitted the agency to make the decision it did." *Norton*, 564 F. Supp. 3d at 568 (citation omitted). In so doing, the Court "must apply the proper standard of review outlined in the APA," while simultaneously confining its analysis to the administrative record. *Id.* at 569 (citing *Alexander v. Merit Sys. Protection Bd.*, 165 F.3d 474, 480-81 (6th Cir. 1999)).

## III.

### A. Plaintiff's NEPA and APA Claims

All four of Plaintiff's claims take aim at a different procedural deficiency within the Corps' administrative review process.[6] Plaintiff's partial summary judgment motion, however, is largely cabined to two specific issues: (1) the Corps' apparent failure to consider all of the "reasonably foreseeable" environmental "effects" of its permit approval, as required by NEPA and the Corps' own regulations; and (2) the Corps' alleged "improper" reliance on various information provided by DeepRock. The Court addresses each of these matters below. Before that, however, some background on NEPA is needed.

### B. NEPA's "Hard Look" Requirement

NEPA mandates all "federal agencies" to "'take a 'hard look' at the potential environmental consequences of their actions.'" *Kentuckians*, 746 F.3d at 703. More specifically, it requires them to "prepare a detailed statement"—*i.e.*, an EIS—"for every 'major Federal action [] significantly affecting the quality of the human environment." *Id.* (quoting 42 U.S.C. § 4332(2)(C)). Should it be unclear "whether an [EIS] is required, the agency will," as the Corps did here, produce an "environmental assessment"—"a concise public document ... that serves to ... [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact." *Id.* (quoting 40 C.F.R. § 1501.4(e) (internal quotation marks

---

[6] Count One alleges that the Corps "failed to balance the purported benefits of the [DeepRock's] proposed action against its 'reasonably foreseeable detriments," as required by 33 C.F.R. 320.4(a)(1). (*Id.* at ¶ 32.) "Instead," Plaintiff asserts, the Corps "relied on inaccurate information to support benefits for which there was little or no evidence, while ignoring or discounting corresponding detriments relating to the environment, aesthetics, conservation, wetlands, fish and wildlife values, flood hazards, floodplain values, land use, recreation, water quality, and social justice." (*Id.* at ¶ 33.) Count Two alleges that the Corps' Virtual Meeting "was a farce," and, therefore, that the agency was procedurally compelled to hold a formal public hearing. (*Id.* at ¶¶ 34-38.) Counts Three and Four, respectively, assert that the Corps violated NEPA by (1) failing to consider "all reasonable alternatives," and (2) "impermissibly predicat[ing]" its Environmental Assessment on a "previous assessment of another facility (Green Hunter) from 2014" and/or failing to produce an environmental impact statement that "address[ed] all of the environmental effects of the DeepRock Project." (*Id.* at ¶¶ 39-48.)

omitted). "In practice, the environmental assessment generally serves as the finding of no significant impact when an [EIS] is not required." *Id.*

The parties agree "the claims in this case arise under [NEPA's] 1978 regulations, as amended in 1986." (Corps Mot., ECF No. 46 at PageID #9072 n. 9); *accord* (Pl.'s Mot., ECF No. 40 at PageID #9001 n. 2.) Part of those regulations—which have twice been partially revised since 2020[7]—required agencies to "consider what 'significantly' means" in the context of determining whether a federal action "significantly affects the quality of the human environment." *Ocean Advoc. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005) (citing 40 C.F.R. § 1508.27). Generally, that inquiry consisted of "two components: context and intensity." *Id.* "Context refer[rred] to the setting in which the proposed action takes place"—here, the "Belleville Pool" of the Ohio River. *Id.*; (R. at 4246.) "Intensity mean[t] 'the severity of the impact.'" *Id.* at 865 (citing 40 C.F.R. § 1508.27(b)).

> In considering the severity of the potential environmental impact, a reviewing agency may consider up to ten factors that help inform the "significance" of a project, such as the unique characteristics of the geographic area, including proximity to an ecologically sensitive area; whether the action bears some relationship to other actions with individually insignificant but cumulatively significant impacts; the level of uncertainty of the risk and to what degree it involves unique or unknown risks; and whether the action threatens violation of an environmental law.

*Id.* (citing 40 C.F.R. § 1508.27(b)(3), (5), (7), (10)).

## IV.

Plaintiff, as alluded, centers its Partial Motion for Summary Judgment on two distinct arguments.[8] *First*, it asserts the Corps improperly skewed its environmental assessment—and by

---

[7] *See* National Environmental Policy Act Implementing Regulations Revisions, 87 Fed. Reg. 253453-01 (April 20, 2022), 2022 WL 1155729.

[8] As Plaintiff tailors neither argument to a specific count within its Complaint, the Court construes them globally (*i.e.*, as intended to support Counts I, III, and IV).

extension, its FONSI—by "refus[ing] to consider anything beyond the footprint of [DeepRock's] facility in its public interest and alternatives analyses." (Pl.'s Mot. at ECF No. 40 at PageID #9002-05.) In so doing, Plaintiff contends the Corps failed to evaluate all of the "relevant factors" that NEPA (and the agency's own regulations) required it to assess. *Second*, Plaintiff argues the Corps "improperly rel[ied]" on "consultations" with certain federal and state agencies—specifically, the U.S. Coast Guard and the OEPA—that never actually occurred, all while "rubberstamping" the information DeepRock provided for its environmental review. (*Id.* at PageID #9005-07.)

Ultimately, Plaintiff's arguments fall short. As explained below, the Corps was within its right not to consider the "probable impacts" of certain activities over which it had no regulatory authority—namely, DeepRock's storage of "Class II wastewater." Nor did the Corps rely on any specific "consultation" with the Corps or OEPA, or "improperly" consider the information DeepRock supplied. None of those points throws the sufficiency of the Corps' environmental assessment into serious doubt.

Whether or not the Corps "adequately" evaluated *all* of the relevant environmental consequences of its decision is, admittedly, a closer call. *See Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 583-84 (6th Cir. 2014). There is, as noted below, some indication the Corps failed to maximally investigate how, specifically, DeepRock's "reactivation" of its unloading facility would impact "river traffic," or the extent to which that traffic could cause a spill of hazardous waste. At the same time, the record reflects that the Corps specifically acknowledged these potential issues, and, for various reasons, deemed them to be of "negligible" or "minimal" significance. That is enough to meet the "deferential standard" that this Court must apply. *Klein*, 753 F.3d at 581.

## A. The Corps Properly Narrowed the Scope of its Review and Otherwise Provided a Sufficient Basis for its FONSI

As Plaintiff notes, the Corps' own permitting regulations—in addition to those implementing NEPA—required the agency to "careful[ly] weigh[] . . . [t]he benefits which reasonably may [have been] expected to accrue from [DeepRock's] proposal . . . against its reasonably foreseeable detriments." 33 C.F.R. § 320.4(a)(1); *see* 40 C.F.R. § 1501.2(b). Such obligated it to consider the "environmental consequences" of approving DeepRock's § 10 application, as well the decision's "probable impacts"—"cumulative" or otherwise—"on the public interest." 33 C.F.R. § 320.4(a)(1); *Kentuckians*, 746 F.3d at 703; *see also* 40 C.F.R. §§ 1508.7-.8 *invalidated by* 85 Fed. Reg. 43304, 43344 (July 16, 2020) (defining, among other things, a "cumulative impact" to consist of "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions.").

Plaintiff contends the Corps "explicitly" failed to engage in this analysis—namely, by "narrow[ing] the scope of [its] review" to the local "footprint" of DeepRock's loading dock. (Pl.'s Mot., ECF No. 40 at PageID # 9003-05.) By assuming this crabbed view, Plaintiff argues the agency licensed itself to ignore a host of topics and events that were either logically implicated by, or "reasonably foreseeable" consequences of, the dock's "reactivation," including: (1) "[t]he nature of the cargo" DeepRock intended to unload at its barge facility; (2) "the upland storage tanks" where this "cargo" would ultimately wind up; (3) "drinking water and aquifers[;]"  (4) "[the] occurrence of spill events[;]" and (5) "increased vessel traffic." (*Id.*) As Plaintiff argues, these issues—*regardless* of whether they fell within the Corps' "regulatory purview"—needed to

16

be meaningfully considered by the agency to satisfy NEPA's "hard look" requirement. And because that did not happen, Plaintiff concludes, DeepRock's § 10 permit must be set aside.

Defendants counter that Plaintiff's contentions are neither supported by the record nor the law of this circuit. They emphasize, for one, that the Corps was entitled to "reasonably limit [its] NEPA review" to the local "footprint" of DeepRock's barge dock. 746 F.3d at 710. But even so, they argue, the Corps nonetheless considered the "cumulative" downstream effects of its permit approval—including those noted by Plaintiff—and properly determined that they would not, in their totality, render a "significant impact" on the "human environment."

Defendants initial point, while overreaching, is not entirely off-base. The law in this jurisdiction is clear: "[I]n the context of a complete regulatory scheme," an agency "may reasonably limit [its] NEPA review to only those effects proximately caused by the actions over which [it] ha[s] regulatory responsibility." *Id.* at 710. Here, the record reflects that the Corps did not (and does not) regulate DeepRock's upland storage facilities, or the fluid those facilities store; that "responsibility" fell to a slew of other agencies—namely, the U.S. EPA, OEPA, and ODNR. (*See* R. at 910, 916.) Thus, contrary to Plaintiff's assertion otherwise, the Corps had no discernable obligation to consider the "proximate effects" of those facilities in its environmental review.[9] *See Kentuckians*, 746 F.3d at 710.

NEPA's implementing regulations did, however, require the Corps to consider the "reasonably foreseeable" environmental consequences of DeepRock's "reactivated" barge dock.

---

[9] This, to be sure, does not mean the Corps was only bound to consider the environmental "effects" it had the authority to regulate. The Corps appears to suggest otherwise in its briefing, pointing to the U.S. Coast Guard's "authority to regulate the transportation of hazardous materials in commerce" and the ODNR's oversight over the "storage . . . and disposal" of oil waste to illustrate that it had no "jurisdiction" to consider "other effects" of DeepRock's activity, "such as spills." (Corps Mot., ECF No. 46 at PageID #9080, 9083-84). That is incorrect. Again, the Corps was compelled to consider the "effects proximately caused" by the "*actions* over which [it] ha[d] regulatory responsibility." *Kentuckians*, 746 F.3d at 710 (emphasis added). Whether or not the Corps directly monitored or regulated those "proximate effects" is irrelevant.

*See* 40 C.F.R. § 1508.8(b). And unquestionably, one of those potential consequences was an increase in "river traffic"—an event which, by itself, "elevates" the risk of hazardous spills. *Ocean Advoc.*, 402 F.3d at 868-69. It defies logic to believe otherwise.  *See id.* at 869 (noting that an oil company's "dock extension" enabled it to handle "even greater increases in [vessel] traffic," which brought with it an "attendant increased risk of oil spills").

Were the Corps to have entirely ignored these points, the Court would be hard-pressed to imagine a more glaring NEPA violation. *See id.* at 869 (requiring the Corps to craft an EIS when it failed to "provide *any reason* for ignoring the potential increase in tanker traffic" or for "declining to weigh the risk of oil spills while traveling against the reduced risk of a spill while docked") (emphasis added). But that did not happen here. That is, the Corps *did* consider the potential increase in "river traffic" that could flow from DeepRock's "reactivated" barge dock. (R. at  4183, 4201, 4216, 4246-47.) So too did it acknowledge the "possibility of spills." (R. at 4250.) It did not, however, deem those potential risks to be "significant," given (1) their "exist[ence] in all major navigational thoroughfares" like the Ohio River; (2) the "navigational safety" standards the U.S. Coast guard would invariably require DeepRock (and the shipping company it used) to follow; and (3) the certain regulatory oversight of various other agencies. (R. at 4217, 4246-47, 4250.) And in support of this conclusion, the agency cited, among other things, (1) a public study on the amount of "commercial cargo" (including "coal, oil, and petroleum") transported "on the Ohio River each year" (about "230 million tons"); (2) the array of similar projects authorized by the Corps in the "Mile Run-Ohio River Watershed" between 1932 and 2020; (3) the U.S. Coast Guard's own regulations (as well its apparent lack of "concern" with DeepRock's proposal); and (4) various risk-mitigating "special conditions" embedded within its permit, which, notably, required DeepRock to (a) submit a "Spill Prevention, Monitoring, and Response Plan," and (b)

"install and maintain, at [its] expense, any safety lights and signals prescribed the United States Coast Guard." (R. at 4170, 4213, 4221, 4227-33, 4262.)

That does not mean the Corps' environmental analysis was flawless. Repeatedly, the agency admitted it was "unaware of any studies" indicating that DeepRock's conduct would diminish the water quality of the Ohio River "beyond what the system has already endured," or that it would "overstress" the river's "in-land navigation systems." (R. at 4243, 4246.) And to some extent, it implied that the absence of this information suggested those potential "impacts" would not be "significant." (*See id.*) This was erroneous. A lack of "studies" into a particular environmental risk says absolutely nothing about that risk's potential severity. And it eludes this Court as to why the Corps chose to passively acknowledge the absence of this information, rather than obtain it.

Nevertheless, the inquiry here is *not* whether the Corps expended *all possible resources* to assess the potential "effects" of DeepRock's barge dock; it is whether the agency "*adequately* studied the issue and [took] a hard look at the environmental consequences of its decision." *Klein*, 753 F.3d at 581 (emphasis added). Given the rationale the Corps offered—which, as discussed, was based on a variety of unchallenged information—the Court cannot say the agency failed to meet this "deferential standard." *See id.* at 583-84 (upholding the validity of a Department of Energy FONSI regarding a proposed power plant that would adversely "impact[] forest resources" given, among other things, the agency's articulation that (1) those forest "disturbances [would] occur[] even in the absence of the plant" and (2) the plant would be subject to the continuing oversight of a state regulatory agency); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 126 (D.D.C. 2017) (environmental assessment sufficiently addressed "spill risk" by "devot[ing] several pages" to discussing the "applicable" regulations that would govern

the Dakota Access Pipeline, thereby rendering it "reliabl[e] and safe[]"); *see also Standing Rock*, *supra* at 126 ("Other courts, including this Circuit, have favorably viewed similar agency reliance on applicable regulatory standards when assessing impacts as part of a NEPA-required analysis.").

### B. The Corps Did Not "Improperly" Rely on "Nonexistent" Consultations, nor has Plaintiff Shown the Agency "Rubberstamped" DeepRock's Information

Plaintiff additionally argues that the Corps, despite holding itself out as having "coordinated with all applicable state and federal agencies who have authority and jurisdiction at the site of the proposed project, did not "coordinate" with the U.S. Coast Guard or OEPA "at all." (Pl.'s Mot., ECF No. 40 at PageID #9006.). So too, Plaintiff contends, did the agency "blind[ly] rely" on "unsupported information provided by . . . DeepRock"—including the "entire 9-page Alternatives Analysis" used by the Corps in its environmental assessment and a 13-page "Response to Public Comment." (Pl.'s Mot., ECF No. 40 at PageID #9006.) In Plaintiff's view, these facts, whether considered separately or as a whole, demonstrate that the Corps "never performed [an] independent and impartial review" of DeepRock's § 10 application, thus rendering its permit approval unlawful. (*Id.* at PageID #9007.)

Plaintiff's initial argument is easily dispatched. As Defendants note, nothing in the record suggests the Corps relied on its "contacts" or "coordination" with the U.S. Coast Guard or OEPA to render its decision.[10] If anything, the Corps considered those agencies *lack of contact* to goad in DeepRock's favor. (*See* R. at 906, 915) (noting that copies of the Public Notice were directly sent to several state and federal agencies, including the OEPA and U.S. Coast Guard); (R. at 4213, 4356) (noting that the OEPA never responded to the Public Notice, and that "[n]o concerns

---

[10] True, the Corps considered DeepRock's representation that the shipping company it intended to "utilize . . . ha[d] received [U.S. Coast Guard] approval for the transportation of traditional well waste." (R. at 4200.) But there was nothing inherently improper about this. As Plaintiff itself concedes, the Corps' own "regulations allow for the permit applicant to provide information required for NEPA." (Pl.'s Mot., ECF No. 40 at PageID #9006.)

regarding navigation were expressed by the [U.S. Coast Guard]"). And as Defendants note, the Corps had no specific obligation to obtain comment from those agencies to properly render its environmental assessment. *See* 40 C.F.R § 1501.5(e) ("Agencies shall involve the public, State, Tribal, and local governments, relevant agencies, and any applicants, to the extent practicable in preparing environmental assessments.")

Plaintiff's second argument also fails. As the Corps notes, NEPA's implementing regulations contemplate that "[a]n agency may require an applicant to submit environmental information for possible use by the agency in preparing an environmental document." 40 C.F.R. § 1506.5(b). This might entail the agency to "outlin[e] the types of information required," or to "provide guidance to the applicant" on how to prepare a specific document. *Id.* § 1506.5(b)(1). That seems to be exactly what the Corps did with DeepRock's "Alternatives Analysis" and "Response to Public Comment." (R. at 133, 817.) And so long as the agency "independently evaluate[d]" that information and took responsibility for its "accuracy, scope, and contents," there is no NEPA problem. *See City of Roseville v. Norton*, 219 F. Supp. 2d 130, 166-67 (D.D.C. 2002). Nor, for that matter, does one arise under the APA.

Plaintiff offers no evidence that the Corps failed to "independently evaluate" or take "responsibility for" the information DeepRock submitted. It merely points to the Corps' solicitation and apparent use of that information—a process that NEPA allows—as proof of bias. *See* 40 C.F.R. § 1506.5(b). That is not enough. *See City of Roseville*, 219 F. Supp. 2d at 166-67.

## C. Conclusion

Plaintiff's Motion for Partial Summary Judgment, as noted, subsists on the arguments discussed above. As none is fruitful, Plaintiff's motion is **DENIED**, and Defendants' cross-motions for summary judgment, insofar as they relate to Counts I, III, and IV of Plaintiff's complaint, are **GRANTED**.

## V.

Plaintiff's Motion for Partial Summary Judgment explicitly declined to move for judgment on Count II of its complaint, which alleges that the Corps' Virtual Meeting "was a farce" and "did not comply with [the Corps'] own policies and regulations about public meetings." (Compl., ECF No. 1 at ¶¶ 34-38.) Normally, that would not be an issue. But it is here.

Again, the only apparent "mechanism" through which Plaintiff can obtain relief on Count II is summary judgment. *See* DeepRock Reply, ECF No. 48 at PageID #9114) (quoting *Deese v. Esper*, 483 F. Supp. 3d 290, 303-04) (D. Md. 2020); *see also* 2 Am. Jur. 2d Admin. Law § 544 (2d ed. 2022). It stands to reason, then, that a failure to timely invoke that "mechanism" for a specific claim will be fatal to the claim itself. *See* Am. Jur. 2d Admin. Law § 538 ("[A]n agency's decision carries a presumption of validity, and the appellant *bears the burden* of making a convincing showing by clear and satisfactory evidence that the decision is invalid because it is unjust; unreasonable; unlawful; arbitrary; capricious; or an abuse of discretion, not supported by substantial evidence, or wrong.") Such is the case here. As the docket reflects, Plaintiff, by its own agreement, was bound to move for summary judgment on *all* of its claims by September 24, 2021. (ECF No. 38.) That deadline has clearly passed. Thus, Plaintiff cannot obtain judgment as matter of law on Count II.[11]

Even if Plaintiff had actually moved for summary judgment on that claim, it would be unlikely to prevail. As Defendants note, "[n]o law or regulation" explicitly governed *how* the

---

[11] Plaintiff's counsel, perhaps realizing this, makes a last-ditch effort to preserve the claim in his Reply in Support of its Motions for Summary Judgment and in Opposition to the Defendants' Cross-Motions for Summary Judgment. (ECF No. 47 at PageID #9009-10.) Citing his own experience at the Virtual Meeting, he notes that "most people" at the meeting objected to its "format, timing, and unusable interface," and that he "witnessed [the Corps] tak[e] every opportunity to obfuscate the process, prevent public participation, and pay mere lip-service to NEPA Policy." (*Id.*) This argument is insufficient for a variety of reasons—a primary one being that it cites no part of the administrative record (let alone any specific facts therein). *See Sierra Club v. Slater*, 120 F. 3d 623, 638 (6th Cir. 1997) (noting that, "[a]s a general matter, 'courts confine their review to the 'administrative record'" on review of APA claims).

Virtual Meeting—which the Corps held informally—was to proceed. *See* 33 C.F.R. § 327.4(b) (solely noting that, upon request for a public hearing, the Corps' district engineer "may expeditiously attempt to resolve the issues [underlying the request] informally"). And it is not as though the Corps lacked *any* basis to avoid hosting a large, informal public gathering; as Defendants note, the Corps' decision to host a virtual, informal meeting occurred in the infancy of the ongoing COVID-19 pandemic. (*See* R. at 919.) A decision to host a virtual meeting at that point in time was not exactly unheard of, nor would it be unjustified.

At any rate, Plaintiff's failure to timely move for summary judgment on Count II is fatal to the claim's survival. Accordingly, Defendants' cross-motions for summary judgment are **GRANTED** as to that claim.

**VI.**

For the foregoing reasons, the Court **DENIES** Plaintiff's Partial Motion for Summary Judgment (ECF No. 40) and **GRANTS** Defendants' cross-motions for summary judgment (ECF Nos. 45, 46). Plaintiff's claims are **DISMISSED**, and this case shall be closed on the docket of this Court.

**IT IS SO ORDERED.**

**9/20/2022**                                 **s/Edmund A. Sargus, Jr.**
**DATE**                                      **EDMUND A. SARGUS, JR.**
                                              **UNITED STATES DISTRICT JUDGE**